

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00884-CV

**IN THE INTEREST OF I.J.A.**, A.J.A III, A.J.A, X.J.A., and E.J.A.

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2024PA00046
Honorable Raul Perales, Judge Presiding

Opinion by:    Adrian A. Spears II, Justice

Sitting:       Irene Rios, Justice
               Lori I. Valenzuela, Justice
               Adrian A. Spears II, Justice

Delivered and Filed: June 11, 2025

AFFIRMED

Appellant Robert A.[1] appeals the trial court's order terminating his parental rights to his seventeen-year-old son I.J.A., his sixteen-year-old son A.J.A. III, his fourteen-year-old daughter A.J.A., his thirteen-year-old son X.J.A., and his twelve-year-old son E.J.A.[2] On appeal, he argues the evidence is legally and factually insufficient to support the trial court's predicate findings under subsections (D), (E), and (O). Robert A. also argues the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in his children's best interest. We affirm.

---

[1]To protect the identity of the minor children, we refer to the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).
[2]The children's mother is deceased.

**SUFFICIENCY OF THE EVIDENCE**

*A. Standard of Review*

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings by the trial court, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the trial court, as factfinder, is the sole judge of the weight and credibility of the evidence. *Id*.

*B. Predicate Grounds: Subsections (D) and (E)*

Robert A. challenges the three predicate grounds found by the trial court: endangerment under subsections (D) and (E), and failure to complete his family service plan under subsection (O). *See* TEX. FAM. CODE § 161.001(b)(1)(D),(E),(O). Only one predicate ground is necessary to support termination of parental rights under section 161.001(b)(1) when there is also a best interest finding. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Therefore, if an appellate court finds the evidence sufficient to support one predicate ground, in affirming a trial court's order of

termination, it need not address an appellant's challenge to the remaining predicate grounds. *Id*. However, "[b]ecause of the potential future consequences of an endangerment finding for parental rights to another child, we begin by addressing the sufficiency of the evidence to support the trial court's findings under subsections (D) and (E)." *In re B.N.D.*, No. 04-21-00286-CV, 2021 WL 6127883, at *2 (Tex. App.—San Antonio Dec. 29, 2021, no pet.); *see In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (explaining that because an endangerment finding under subsections (D) or (E) may be used in a future termination proceeding involving a different child, subsection (D) and (E) findings, if challenged on appeal, must be reviewed regardless of whether sufficient evidence exists to support another predicate ground).

Subsection (D) allows termination of parental rights if, along with a best-interest finding, the factfinder finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

Subsection (E) allows termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection (E), the trial court must determine "whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being." *In re C.J.G.*, 2019 WL 5580253, at *2.

Under both subsections (D) and (E), "endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *Id*. at *3 (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *Id*. at *2 (quoting *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.)) (alteration in original). "Under subsection (D), a trial court considers 'evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being.'" *In re J.A.B.*, No. 04-23-00907-CV, 2024 WL 1421986, at *2 (Tex. App.—San Antonio Apr. 3, 2024, pet. denied) (quoting *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). "Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child." *Id*. (quoting *In re J.T.G.*, 121 S.W.3d at 125). "For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id*. (quoting *In re J.T.G.*, 121 S.W.3d at 125). "Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *Id*. (quoting *In re J.T.G.*, 121 S.W.3d at 125). "Similarly, under subsection (E), '[a]n endangerment finding often involves physical endangerment, but the statute does not require that the parent's conduct be directed at the child or that the child suffer actual injury.'" *Id*. (quoting *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied)) (alteration in original). "Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id*. (quoting *In re K.J.G.*, 2019 WL 3937278, at *5). "Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id*. (quoting *In re K.J.G.*,

2019 WL 3937278, at *5). "Thus, evidence of illegal drug use by a parent and its effect on a parent's life and h[is] ability to parent may establish an endangering course of conduct under subsection (E)." *Id*. (quoting *In re K.J.G.*, 2019 WL 3937278, at *5).

"While 'endanger' has the same definition under both subsections (D) and (E), 'there are some distinctions in the application of subsections (D) and (E).'" *Id*. at *3 (quoting *In re C.J.G.*, 2019 WL 5580253, at *3). "Termination under subsection D may be based upon a single act or omission." *Id*. "In contrast, termination under subsection E 'may not rest on a single act or omission; it must be a voluntary, deliberate, and conscious course of conduct.'" *Id*. (quoting *In re C.J.G.*, 2019 WL 5580253, at *3). Additionally, "[i]n evaluating endangerment under subsection D, we consider the child's environment *before* the Department obtained custody of the child." *In re C.J.G.*, 2019 WL 5580253, at *3 (quoting *In re S.R.*, 452 S.W.3d at 360) (emphasis added). "Under subsection E, however, courts may consider conduct *both before and after* the Department removed the child from the home." *Id*. (quoting *In re S.R.*, 452 S.W.3d at 360) (emphasis added).

The supreme court has explained that "the endangering conduct may include the parent's actions before the child's birth . . . including evidence of drug usage." *In re J.O.A.*, 283 S.W.3d at 345. "While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial risk of harm." *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) (emphasis in original). "A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id*. (quoting *In re J.O.A.*, 283 S.W.3d at 345).

Turning to the evidence, we first review the trial court's finding of endangerment under subsection (D). Robert A. argues that no evidence showed he knowingly endangered the children.

According to Robert A., the Department's investigator, Rafaela Miranda, testified only that she had "concerns" about the children being in danger. He argues the children were removed from his care because the Department's safety plan was broken and not because the children were endangered. This argument, however, fails to accurately reflect the evidence presented at trial.

Rafaela Miranda testified that she was an investigator in a special unit called alternative response. According to Miranda, in November 2023, a referral came into the Department alleging that Robert A. had sexually abused A.J.A. and that Robert A. was using methamphetamines and amphetamines. In December 2023, another referral came into the Department alleging neglectful supervision of the children. Miranda testified that Robert A. submitted to a drug test that was collected on December 11, 2023, which was positive for methamphetamines, amphetamines, and marijuana. When Miranda asked Robert A. about this positive drug test, Robert A. claimed that the positive result was due to a contaminated bottle from a friend. The caseworker testified that Robert A. stated he had a real bad toothache, and got a bottle of Tylenol from a friend. Robert A. told the caseworker "in that bottle was some—an old baggie of meth that he had forgot[ten] about." Robert A. told the caseworker the methamphetamine "must have got[ten] on the—on the—on the pill, on the Tylenol, and that's how he tested positive."

Miranda testified that "we also had concerns that [Robert A.] had two medically fragile children in need of care." I.J.A. has "bone dysmorphia" and "was always in a lot of pain." X.J.A. has severe asthma, which has required him to be hospitalized. The children's mother passed away from "an asthma-related incident." Miranda testified that the family had an "extensive" history with the Department, beginning in 2011, and there had been eight referrals. According to Miranda, the consistent theme among all the referrals was that Robert A. "was using drugs and medical neglect," which was the reason for the children ultimately being removed from Robert A.'s care.

Miranda testified that a third intake came into the Department in January 2024, alleging domestic violence between Robert A. "and his paramour," which caused A.J.A. to be injured. Miranda met with Robert A. in December 2023, but then he "fell off the radar with the children," causing her to call and text different phone numbers, and then leave messages. Miranda testified, "And it was at that point that I was informed that he had gone to Corpus [Christi] with the children." Miranda then "reached out to a family member in Corpus as well and left messages." When she finally was able to talk to Robert A., he claimed "his paramour at the time, Ms. Felicia" had made up the claims of domestic violence. He claimed Felicia was "trying to make him lose his children." However, in that same conversation with Robert A. on the phone, Miranda could hear Felicia talking in the background. Miranda testified she could hear Robert A. and Felicia arguing.

Miranda testified that before the children were removed, she made two safety plans for Robert A. The first one required a neighbor to check on Robert A. and the children three times per day. The second one involved a friend who was supposed to live in the home and monitor all contact. Miranda discovered that the safety plans had been broken. The friend told Miranda that "she never—she was not allowed to stay in the home, so she was never able to be that safety plan monitor." Miranda began looking for the children and calling their schools, which resulted in her learning the children were truant. I.J.A., who has bone dysmorphia, said that he was not going to school because his leg was hurting too much and the school was too big for him to be able to get around. A.J.A. III said he did not want to go to school, did not like school, and did not want to be there. A.J.A. liked to go to school but did not attend because her brothers did not go.

Miranda testified that the children "reported that the domestic violence happened." A.J.A. had been injured when Robert A.'s "paramour," Felicia, threw a perfume cap and hit A.J.A. on the lip. The domestic violence happened in front of the children. Robert A. claimed that Felicia was

"the aggressor." According to Miranda, three police reports were made between Robert A. and Felicia regarding domestic violence incidents.

Miranda explained that the Department was very concerned about I.J.A.'s and X.J.A.'s medical needs. According to Miranda, it was difficult for Robert A. to take the children to their medical appointments. Miranda testified that Robert A. placed the blame on "medical insurance" or the medical providers rescheduling appointments as the reason the children were not able to "get in" with their medical providers. Miranda testified that Robert A. had to take X.J.A. twice to the emergency room for asthma attacks—once while the family was staying at Haven for Hope and another time when they were living with Robert A.'s "paramour." Miranda testified that Robert A. admitted to smoking marijuana in the home despite his son suffering from severe asthma complications and his wife dying of asthma complications.

Miranda testified that after she had worked with Robert A. for five months, in January 2024, the children were finally removed from his care and placed in the care of the Department.

Relying on the above evidence, which all occurred before the children were removed, the trial court could have found that Robert A.'s illegal drug use, his domestic violence with Felicia in the presence of the children, his extensive history of referrals with the Department, and his smoking of marijuana in the home where he had an asthmatic child all supported a finding that his conduct resulted in a home environment with potential danger to the children's well-being. *See In re J.O.A.*, 283 S.W.3d at 345 (parent's illegal drug use prior to child's birth is evidence of endangerment); *In re J.A.B.*, 2024 WL 1421986, at *2-3 (parent's violent conduct and illegal drug use in the home creates an environment with potential risk to the child's physical and mental well-being); *see also In re C.J.G.*, 2019 WL 5580253, at *3 (relevant time period under (D) is prior to removal). We conclude that this evidence is legally sufficient to support the trial court's finding of

endangerment under subsection (D). *See* TEX. FAM. CODE § 161.001(b)(1)(D) (parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child").

With regard to factual sufficiency, we note that Robert A. testified that his positive drug test before removal was the result of a contaminated bottle he got from his friend. Robert A. testified he does not use methamphetamines and does not have substance abuse problems. He admitted to using marijuana, but "[n]ot on a daily basis." There was also evidence Robert A. blamed the domestic violence on Felicia being the aggressor. As factfinder, however, the trial court could have determined that Robert A.'s testimony was not credible. *See In re J.O.A.*, 283 S.W.3d at 345. Thus, we also hold the evidence is factually sufficient to support the trial court's finding of endangerment under subsection (D).

In reviewing the trial court's endangerment finding under subsection (E), we focus on the evidence of Robert A.'s course of conduct before and after the children's removal. *See In re J.A.B.*, 2024 WL 1421986, at *3 (termination under subsection (E) requires a voluntary, deliberate, and conscious course of conduct by parent); *In re C.J.G.*, 2019 WL 5580253, at *3 (relevant time period under (E)). In addition to the above evidence of Robert A.'s drug use before removal, there was evidence that Robert A. had been sent for random drug testing "between fifty to sixty times" in the ten months the underlying case was pending and that he went only once and was turned away because the drug testing facility did not have a monitor. Katrina Espinoza, the caseworker, said she removed the requirement of the monitor and yet Robert A. still did not submit to a drug test. According to Espinoza, since the last court hearing before the trial, she sent Robert A. for a hair follicle test. Espinoza testified that she spoke with the facility, which said Robert A. had gone to the facility but had arrived with no hair on his head. Robert A. told the facility he also had no

body hair from which a sample could be taken. Espinoza asked if Robert A. had at least submitted a urine sample because she had informed him that he would also have a UA test. The woman at the facility said that she had told Robert A. to submit urine for a UA, but he declined. During his testimony, Robert A. claimed he had not removed all the hair from his body before the hair follicle test in an attempt to avoid the test. However, the trial court, as factfinder, could have inferred from the testimony that Robert A. did intentionally avoid submitting to the hair-follicle test and then refused to take the urine test. Further, the trial court could have relied on the evidence that Robert A. had been sent for drug testing between fifty to sixty times and only went once to infer that Robert A. refused to submit to drug testing. A parent's refusal to comply with the Department's requests for drug testing may give rise to a reasonable inference that the parent's refusal is due to continued illegal drug use. *See In re E.A.R.*, 672 S.W.3d 716, 723 (Tex. App.—San Antonio 2023, pet. denied); *see also In re R.R.A.*, 687 S.W.3d at 278 (explaining that a parent's pattern of drug use accompanied by "circumstances that indicate related dangers to the child" can establish a substantial risk of harm).

Further, since the time the children were removed in January 2024, Robert A. has become involved in another Department case where he is the presumed father of a baby delivered by Felicia. On September 20, 2024, the baby was removed and placed into the Department's care. Niki Motal, an investigator with the Department, discussed the allegations with Robert A., who denied any illegal drug usage and claimed he and Felicia "were in a happy relationship." According to Motal, both Robert A. and Felicia stated that he resided with her. Motal asked Robert twice to submit to drug testing, but he refused. Motal testified that Robert A. admitted to using marijuana "because he has a tumor and because of his seizures," but did not have a prescription. During his testimony, Robert A. also admitted he had not been diagnosed with these medical conditions. From

all this evidence, the trial court could reasonably infer that the reason Robert A. did not submit to drug testing during the pendency of the case was because he continues to have a substance abuse problem that continued after the children's removal.

In reviewing the evidence before and after the children's removal, we conclude the evidence is legally sufficient to support the trial court's finding under subsection (E). Further, while Robert A. denied illegal drug use and had many excuses for why he did not submit to drug testing, the trial court could have determined that his testimony was not credible. Thus, we also hold the evidence is factually sufficient to support the trial court's subsection (E) finding.[3]

*C. Best Interest of the Children*

Robert A. also argues the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in his children's best interest. Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, a court should consider the factors set out in section 263.307 of the Family Code. *See* TEX. FAM. CODE § 263.307(b).[4] In

---

[3]Having determined the evidence is legally and factually sufficient to support the trial court's findings under subsections (D) and (E), we need not consider Robert A.'s challenge to the sufficiency of the evidence to support the other predicate finding under subsection (O). *See In re D.J.H.*, 381 S.W.3d 606, 611-12 (Tex. App.—San Antonio 2012, no pet.) (along with a best-interest finding, only one predicate violation under section 161.001(b)(1) is necessary to support a termination decree).

[4]These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurture, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home

addition to these statutory factors, in considering the best interest of the child, a court may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[5] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a court may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

In support of his argument, Robert A. points to evidence that (1) the children were split on their desire to be reunified with him; (2) he was employed with temp agencies at the time of trial; and (3) the Department's permanency goal for the children was, in his words, "highly uncertain." However, this argument by Robert A. omits much evidence in favor of termination of his parental rights being in the children's best interest.

First, as explained above, we have already determined there is legally and factually sufficient evidence to support the trial court's endangerment findings. Thus, the evidence of Robert A.'s endangerment of the children before and after removal is probative of termination of his parental rights being in the children's best interest. *See In re E.A.R.*, 672 S.W.3d at 722. The caseworker further testified that Robert A. had not made the necessary changes to remove the Department's concerns of substance abuse and family violence. The caseworker testified that a

---

environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[5] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

prior case with the Department was "pretty much due to the same circumstances" as those involved in this case. Since this case, he has a new case involving the baby, which also has the same underlying circumstances.

Second, there was evidence that at the time of trial, Robert A. could not provide a safe and stable home for the children. Although the case had been pending for eleven months, at the time of trial, Robert A. testified he had just started applying for jobs. He testified he had gotten a job with a temp agency that would start about three weeks after trial, but the job was for "little, small gigs . . . . like the parking attendant." He admitted that he was homeless and had been "staying at a friend's house." When asked what had stopped him from obtaining housing during the pendency of this case, Robert A. replied, "Well, because the children are not with me. They won't give me housing if I'm only by myself." Robert A. was asked where he planned to live with the children if they were returned to him. He stated that he would go to a shelter with the children.

Third, the older children do not wish to be returned to his care. The caseworker testified that Robert A.'s visits with the children had not been "appropriate" because there had been "quite a bit of whispering from him to the children." According to the caseworker, the oldest child had accused Robert A. of emotional and physical abuse during the visits and no longer wanted to attend. The second oldest child had also declined to attend the visits for the last two to three months. The caseworker testified she had addressed the situation with those children, but they still did not want to attend the visits. The caseworker testified that the third oldest child, A.J.A., had "made sexual abuse allegations" against Robert A. The first allegation was two months before trial, and the last one was three weeks before trial.

Fourth, the children have been doing well overall since removal. The two children with medical conditions are having their conditions treated. They are attending school. The caseworker

testified that the Department's permanency goal was adoption by their maternal great-aunt in Illinois. Before the great-aunt could adopt the children, the state of Illinois required that she obtain a bigger home for the five children. The great-aunt has rented a five-bedroom home in Chicago. The caseworker testified,

> [The great-aunt] has been nothing short of extraordinary. She has done everything in her power to try and accommodate these children. She was working, you know, weekly trying to get a bigger home, and she did. She got a new car to accommodate for all five children. [D]uring the weekend that she had them, she took them all on these outings. I haven't seen those children that happy since I got . . . the case. She has really, really done her part in trying to be [sic] a good home for them when they do get there.

Both the caseworker and the great-aunt testified about the caseworker bringing the children to stay with her for a weekend in Illinois. The great-aunt testified about how well the visit went. She took the children on outings, including a museum. She talks to all the children regularly by phone and also has video chats with them. She testified that she wants to adopt all five children. She is aware of two of the children's medical needs and is willing to take them to their medical appointments. She testified she was familiar with their medical needs and was capable of taking care of the children. She testified that she is financially able to take care of them. When asked the earliest she could receive all the children, the great-aunt replied, "Today." The caseworker testified that before the children could be placed with their great-aunt, an ICPC study had to be completed. The caseworker testified that the great-aunt was scheduled "to get her home study done." We note that there is nothing in this testimony to indicate it is "highly uncertain," as claimed by Robert A., that the ICPC will not be completed in the great-aunt's favor.

Finally, we note that the caseworker testified about the change in the children once they stayed with their great-aunt for the weekend. The caseworker was asked whether she believed the

visit to Chicago had something to do with the children not wanting to visit Robert A. The caseworker replied,

> I don't think like anything was said or anything like that. But as I stated earlier in my testimony, I had not seen the children that happy at all throughout my case. You know, I think something switched in them where they, you know, saw that they could have a good life. They could have, you know, somebody who loves them and takes care of them. So I think they saw that aspect throughout that visit, yes.

In looking at all the evidence in the light most favorable to the trial court's best-interest finding, we hold the trial court could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344 (quoting *In re J.F.C.*, 96 S.W.3d at 266 ). Thus, we hold the evidence is legally sufficient to support the trial court's finding that termination is in the best interest of the children.

With regard to factual sufficiency, we consider disputed or conflicting evidence. *Id*. at 345. Although there was evidence the children loved their father and the younger children were concerned about moving away from him, we conclude the evidence is factually sufficient to support the trial court's best-interest finding. *Id*.

**CONCLUSION**

Having held that there is legally and factually sufficient evidence to support the trial court's predicate findings under subsections (D) and (E) and to support the trial court's best-interest finding, we affirm the trial court's order terminating Robert A.'s parental rights.

Adrian A. Spears II, Justice